Good morning. Good morning, Your Honors. Matteo Fowler on behalf of the defendant and appellant Smartervitamins Corporation. May it please the Court. The trial court's judgment should be reversed as to Smartervitamins Corporation for three reasons. Findings as to plaintiff's, the appellee's use in commerce state was clearly erroneous. Second, applying the wrong substantially exclusive use test to determine secondary meaning was clearly erroneously applied and prejudiced Smartervitamins' ability to prove secondary meaning at the trial level. And the third issue is that the trial court's decision to dismiss the counterclaims for trademark cancellation should be reversed in part because the trademarks were found to be invalid. Justice Sotomayor Counsel, I think what I, in going through this case, the posture of the case is that you've gone through a whole trial. The district court, no matter how closely we look at the record, the district court is going to have a much better command of the facts and the evidence that we do because the district court weighs the testimony as they come in live. And now we're being asked to reverse on clear error ground, at least as to the factual findings made by the court. And that's not easy to do because the district court did make very specific findings backed up by citations to the evidence in the record. And I appreciate that question, Your Honor. And we're not asking you to re-weigh the evidence. That's not your role. But even assuming all of the evidence that was before the court, it's still not enough. And that's because of the standard that we see in chance, elements of actual use, elements of actual display. You go through the record, you can't find one instance of actual display of the mark in commerce. There was no picture, no contemporaneous documentation to support that. So now if what we're saying is true, any trademark holder or mark holder can come in and say, well, we used it back then, and you have to believe that. How could that show that the mark could create an association of the owner with the brand if we don't even know how it was actually seen, if at all, by the consuming public? That's the one problem, I think, with the record is if you were to paw through it, and by no means are we asking you to do that, you won't find that actual element of display that chance requires. So unfortunately, you can look at this record by not reweighing it and make that determination that the trial court got it wrong in assessing that February 9, 2017 use in commerce date. Counsel, I do have a question. Sure. And it's on the secondary use argument. As I understand it, first of all, your position you're not challenging the factual findings of the district court, correct? We are challenging the finding of February 9, 2017 as the use in commerce date for the plaintiff. Why is that clearly erroneous? Because it's an insufficient evidence to show that it was actually used in commerce under the chance standard. In what way? How is that the case? Because as I understand it, wasn't that the date? Well, explain to me your view of it. Right. So at most, we have, there was testimony that some samples were given to a store, and that's where the evidence stops. Now, the testimony continued on to say that the products were placed on shelves. Did I misunderstand the findings that the district court found that on January 2017, S&I designed a label? Is that correct? That was what the court determined. Well, okay. And that they provided the label to the manufacturer at that time, that they put bottles that were shipped to Nutravita, I believe, in February 2017, that they began shipping bottles to the consumers, February 9, 2017. Why isn't, so what's clearly erroneous about that? Well, what does, so those efforts had nothing to do with drawing an association between the mark and the owner. Moreover, there's really no, pre-launch activities can support- I think you're looking at it really narrowly, right? So tell me why we're wrong in looking at the case this way. We start with the factual finding by the district court, which very specifically says, because plaintiffs were both selling Smarter Nutrition's branded products directly to consumers and displaying their branded products at Nutravita by February 9, 2017. So that's the finding. And then we asked, well, what did the district court cite to in the evidence that relies on that? One of the pieces of evidence is the first invoice to a brick and mortar store has a We can quarrel with that whether that's sufficient support, but once we accept that there is evidence in the record that ties the use and commerce date to February 9, 2017, I would have a hard time finding that that was clearly erroneous. And I appreciate your position on that. And I think if we look at it in a broader context, right, I don't mean to approach it from a myopic view, but that strikes me as token use, right? We don't see any real action taking place until months and months later, right? It was not until the late summer that there was an aggressive launch, which coincided with a transfer of brand. It went from Smarter Nutrition now to Smarter Curcumin, two separate products. There was no allegation of tacking. We don't have anything in the record that says these two marks are the same. You start over. You start from scratch. So if we rushed to the trademark officer, rushed a product to market before it was actually ready, well, it's very similar to just an intent to use application at that point because it's token use. It has nothing to do with associating the mark with the owner. That's what I mean by yes, there is some evidence, but just some evidence is not enough under the actual use and actual display requirements. You need more than just handing off a couple freebies to a brick-and-mortar store. Well, 50 to 100 bottles of supplements were shipped to brick-and-mortar store, which started displaying them. I take your point. I understand better now what your point is, is that there's just the evidence is simply too thin, but since this post-trial, they do get the benefit of reasonable inferences as well. Absolutely, and I do appreciate that judges are entitled to reasonable inference. Looking at the record, we still believe it is insufficient to make that case. Now, that's only half the coin, right? Even establishing that the February 9 date, let's just say you agree with that, it can kind of swing into the opposition to why the trial court's judgment dismissing the plaintiff's claims should be affirmed, because if it is that date, February 9, 2017, that's the date by which the plaintiff should prove up the validity of his trademark and secondary meaning of his mark before the acts of infringement began. Now, because the district court determined that the defendant, my client, Smarter Vitamins, began using its mark in commerce in October of 2016, that he has priority and that 40 years of this court's precedent should not be upended, because there's really no good reason to at this point, right, if we've used the mark in commerce. And I think where the distinction is with Smarter Vitamins and Smarter Nutrition's perspective as to this issue is we believe the court was making its determination as to the validity of the marks, not the scope of the rights in a priority case or in determining whether the natural zone of expansions are. So it's a little bit of a cart before the horse. We don't need to determine market penetration to determine whether a mark is even valid in its own stance. So, for instance, if the mark Smarter Vitamins was used at that brick and mortar and we have to determine whether or not that mark has secondary meaning because it was determined to be descriptive, the scope could just be where it's being used, which really differentiates our situation from Grupo Gigante, which you had a company in Mexico who wanted to come into San Diego. Now the courts, in any of the cases we saw, were not determining the validity of the trademark. They were determining whether or not there were likelihood of confusion or what zone of expansion and or cancellation should occur. Council, just so that I understand your argument, you are though conceding, or you are agreeing that assuming the date is, in fact, February 2017, that Smarter Vitamins have not acquired that secondary meaning by that date? By February 9, 2017? Correct. Yeah. I hate to concede, but on this point, it would be hard for me to argue that we obtained secondary meaning in six weeks. Great. Thank you. I'm going to reserve my time. All right. If it will please the court, my name is Joseph Trojan. I'm an appellant for Mr. Wynn and also for Smarter Nutrition. And looking at that last issue of the evidence in 2017, that somehow the argument that the February sales went to those brick and mortar stores were just a token use, and then there was a long delay. There wasn't a long delay. If we look at 2ER at 316, that is the profit and loss statement for 2017 for Smarter Nutrition, and it shows that significant sales began in July quarter at $16,000, and then by the fourth quarter of that year, they had risen to $1.2 million in sales. So the idea that you're shipping product to get started in February, it's a shipment in commerce, and then you're launching into major sales in the second half of the year while you're trying to promote the products, that is definitely not, does not mean you're a token sale. You're putting it into commerce, and then you're having significant sales. And this argument that somehow that that was because there was this transition to Smarter Curcumin, that's simply not true. There is a, when you look at the bottle for Smarter Curcumin, you see that the Smarter Nutrition trademark is on that bottle. So that was a use of the Smarter Nutrition trademark throughout the, from the very beginning, even though different products were added to that lineup, such as Smarter Curcumin. Critically, there's a huge order of magnitude difference between the two parties. From 2017 to 2021, Mr. Nguyen spent $36 million in advertising to support sales of $73 million. By contrast, before they, the time period they needed to show that they had acquired Secondary and had a trademark would be before we began sales. For that period, they only had three, 33 orders between December and February, December of 2016 and February 2017. Even if we move the date off to what they want, which is December of 2017, they only had 240 orders. So when you look at the huge order of magnitude, there's, I don't think there's any question of who was able to create Secondary Meaning on the mark, and that's clearly Mr. Nguyen. And so if I back out, if I, the numbers are really critical. So that part of the... When do you think he acquired the Secondary Meaning? I think that Mr. Nguyen acquired the Secondary Meaning probably by the end of December of 2017. But critically, when would be the last date upon which he would have not needed to do that? For example, the common law rights that are alleged in the complaint? It would have been by May of 2021, because that's when he filed the complaint. So by when he filed the complaint in May of 2021, he would have needed to have had Secondary Meaning by that particular time for the common law rights. By that point in time, so I need to, I gave you the numbers earlier, I need to back out the numbers to May. So he, by that point, between 2017 and May of 2021, he had spent $31 million in advertising to support $65 million in sales. I don't think there's any question by the time he filed the complaint, he had, he had created Secondary Meaning in this Smarter Nutrition mark. And that raises the issue of our appeal. And that's, we're not appealing any factual finding. We're critical of an issue of law. And the issue of law is in the findings of fact and conclusions of law. ER1, ER15, in paragraphs 41 and 42. And that in paragraph 41 is really a statement of law. Here a defendant began using their mark in commerce in October of 2016. Thus plaintiffs, which is us, must show that the Smarter Nutrition acquired meaning before then. Okay, so he's setting up a test for when we needed to have Secondary Meaning. We had to, he's saying we had to have Secondary Meaning before we even started. We weren't, we, because our first date of use is in February of 2017 when it was launched. That is wrong. Because the junior user, when the, when the senior user, meaning the person who first started using the term, it's not even a trademark at that point because it's descriptive. When the second person comes into the market and the first person has not acquired any Secondary Meaning in the mark, they're not using it as a trademark, so you're not violating their rights. But the second user is entitled to develop Secondary Meaning. And so if anything, I think the law, if there was ever a need for clarification from this court, would be this idea, is it a race to acquire Secondary Meaning between both the junior and senior user? The case law, for example, that we cite to indicates that once the, if the senior user has not acquired Secondary Meaning by the time that the junior user enters the market, then they're cut off from ever being able to do that. So that's, there's stare decisis for that principle, but then there's suggestions, sometimes in the case law, well, it's a race to who creates Secondary Meaning first. The outcome remains the same for us because Mr. Nguyen is a powerhouse marketer. And so he clearly created the Secondary Meaning on a scale that the other party could not do. So, but that's a, that's really an interesting question that the court may want to take up. Is it fair to say, counsel, that he had started the advertising and promotion, but the real ramp up wasn't until the summer of 2017? Is that what the record reflects? I would, I would agree with that. There's all, in any startup, there's, the beginning is a little rough. But clearly he's, even, that was not some token use because you look at the amount of money, even in the first half he's spending $300,000 in advertising. You look at the number of units he's buying, he's buying huge numbers, he's building up an inventory of hundreds of thousands of dollars worth of product in the first half. He started ordering that in late 2016. So he's, he's, and that gets into, you know, the fact that in these cases that they look, sometimes look to priority based upon the pre-start date uses. But, but if anything, that shows that it was not some kind of token use because he was committing hundreds of thousands of dollars to this project to get it up off the ground. And the fact that he knows how to do this and he, and he, and he did, he approached it that way, and then by the end of the year he has sales of $1.25 million. That kind of indicates that, yeah, he definitely knows what he's, what he's doing, and he's doing it correctly and not just doing it to reserve a name. Because what token use is really about is trying to reserve a name. If anyone's trying to reserve a name, it was, it was the other party who had gotten rejected, gave up on the project, then comes back to it, tries to do, make some token sales. Certainly if you're going to talk about token sales, that's 33 orders in December to February. It sounds more like token sales to me. Well, Counselor, you indicate that you, the product, Smarter Nutrition, gained that secondary meaning possibly by the end of December 2017. What's incorrect again by, about the district court's conclusion, legal conclusion? The legal conclusion is that the court said that we had to show we had acquired secondary meaning before the Smarter Vitamins had started. October 2016, I believe. Right. And so we're, and so it wasn't, that, that would be true if, in fact, these were not descriptive marks. But when you're looking at two parties who are, when have adopted descriptive marks, then you, then when their first uses are not trademark uses in the strict sense, they're using a term that's not yet acquired trademark status because the descriptive term has to have secondary meaning. And so, so, so the fact that the court found that there was, we had not acquired secondary meaning by February, that's not something I'm trying to overturn. I don't even disagree with that, if that, that would be true. That's when it first started. So you can look, you can look at your first use date when, and later acquire secondary meaning, and your first use date is still used as your, as your date of, your first use for your date of your registration, if, in fact, you've acquired secondary meaning. It goes into the whole process in the trademark office. You get a, you get a rejection on a descriptiveness, and then you have the option of going to the supplemental register, which the examiner did not require for our marks. Or, or you could, or you can argue you have the evidence for secondary meaning and present it directly to the examiner. When, when you present it directly to the examiner, the examiner does not then say, okay, well we're going to change the first use date to the date that I think you first acquired secondary meaning. Your first use date still remains the first date in commerce that you used it.  And in this case would be February. Right. The first use date was in February. Correct. And so, and then it needed, but it needed more than that. I agree. It needed to acquire secondary meaning. Our disagreement is that legally the district court was wrong in saying when we had to acquire the secondary meaning by. And so it wasn't October 2016. If we disagree with that proposition, then you would lose on that issue, because you're not contesting the facts that the district court relied on. You're absolutely correct. I would lose on that. Absolutely. So. Right. I would, had planned on arguing clearly erroneous standard. I think the court's fully aware of that particular issue, so I won't get into that. And so I'll just yield the balance of my time. Yeah. I'm assuming that the parties are before the USPTO hashing out the rights of the mark. There's no proceedings before the PTO right now. No current proceedings? A state, a state opposition, waiting the outcome of a final determination, because they don't act until there's a final, obviously appealed, removes finality. I see. Okay. Thank you, counsel. Just a few last minutes, Your Honors. We heard a lot about the size of advertising and the size of dollars made. But one thing that's not in the record and one thing that wasn't argued is, how do those numbers associate the mark with the owner? Numbers don't matter unless they draw a connection. That's the purpose of trademark rights. So if it, and there was nothing in the records that said, customers identify that smarter nutrition. A customer did not testify. There were no, there was no direct evidence of secondary meaning. It was all circumstantial. So that's one thing I believe, you know, big numbers seem exciting. And they, you know, it's romantic. But at the end of the day, once you look through it, there's not much there when you can't see how it connects the mark to the owner. And then circling back to secondary meaning and the time when a party needs to prove secondary meaning. There were two issues here. One's determining the validity of the mark. And because both of these marks were descriptive, or at least found to be descriptive, the parties had to prove secondary meaning in order to establish rights. Now, during likelihood of confusion for descriptive marks and trade dress, you're required to also prove, you know, a geographic scope or your natural zone of expansion for where would customers likely confuse these marks. That's why we do secondary meaning. But I haven't heard any argument. I haven't seen any case law to upend over 40 years of precedent in this circuit. And also echoed by McCarthy on trademarks, as well as the various circuits that were cited to in the briefs. Everybody that we've looked at comes down on the line that secondary meaning, an unscripted mark must be proved before the defendant began using its brand, its mark in commerce. Otherwise, we might as well get rid of the affirmative defense of prior use. And I'll yield the rest of my time. Thank you very much, counsel, to both sides for your helpful arguments this morning. The matter is submitted.
judges: TASHIMA, NGUYEN, MENDOZA